**No. 25-3693**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

Mark Charlton-Perkins
Plaintiff – Appellant

v.

UNIVERSITY OF CINCINNATI; KENNETH PETREN, In his official and individual Capacities; GEORGE UETZ, In his official and individual Capacities
Defendants – Appellees

_____

**On Appeal from the United States District Court for the Southern District of Ohio, Case No. 1:20-cv-179**

_____

**APPELLANT'S MERITS BRIEF**

_____

Marc D. Mezibov (OH No. 0019316)
Marc D. Mezibov, LLC
415 Bond Place Unit 10-C
Cincinnati, Ohio 45206
513-582-2018
marcmezibov@gmail.com

*Attorney for Plaintiff-Appellant
Marc Charlton-Perkins*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Appellees make the following disclosures:

1. Is Appellant a subsidiary or affiliate of a publicly owned corporation? **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.    STATEMENT CONCERNING ORAL ARGUMENT ............................1

II.   JURISDICTIONAL STATEMENT .......................................................2

III.  ISSUES PRESENTED FOR REVIEW ....................................................3

IV.   STATEMENT OF THE CASE ...............................................................5

    A.  Statement of Facts........................................................................5

        1.  Charlton-Perkins's Educational and Professional
            Background…………………………………………………...5

        2.  The UC Biology Department Job Opening, the Composition of
            the Committee, and the General  Procedure of the Candidate
            Search Process…………………………………………………..6

        3.  The 2017 Cell Biologist Search…………………………………8

        4.  Charlton-Perkins' Participation in the Search Process:
            Preliminary Screening, Skype Interviews……………………..9

        5.  Office of Equal Opportunity, Diversity and Conflict of Interest
            Concerns…………………………………………………………9

        6.  Charlton-Perkins' Participation in the Search Process:
            Preliminary Screening, Skype Interviews……………………10

        7.  Charlton-Perkins Attends On-Site Interviews……………….11

        8.  The Search Committee Votes on the Hiring Priority of the
            Candidates…………………………………………………..13

        9.  Uetz and Ken Petren Make the Decision to Not Hire  Charlton-
            Perkins…………………………………………………………15

        10. March 8, 2018, Faculty Meeting and the Decision to Cancel the
            Search………………………………………………………16

11. March 20, 2018, Faculty Meeting and the Decision to Cancel the Search…………………………………………………………….19

B. Procedural Posture…………………………………………………...21

V. SUMMARY OF THE ARGUMENT ..........................................................22

VI. ARGUMENT .............................................................................................27

A. Standard of Review……………………………………………..27

B. The District Court Erred In Deciding The Facts And Drawing All Inferences From The Record In A Light Most Favorable To Defendants………………………………………………………27

    Direct Evidence……………………………………..………...29

    Circumstantial Evidence…………………………..…31

    Pretext……………………………………………………...34

        i.  Concerns about Gender Predominated the search……35

        ii.  Conflict of Interest was not a legitimate concern………37

        iii.  The Decision to Disregard the Recommendation of the Committee and Cancel the Search was Highly Irregular.…………………………..…………39

C. The District Court erred in finding that the constitutional violations by Petren and Uetz were not clearly established so as to strip them of qualified immunity for stopping and then cancelling the search….41

D. The District Court erred in holding that Charlton-Perkins' demand for injunctive relief against the individual defendants in their official capacities is barred by the Eleventh Amendment because the relief sought is prospective in nature and not lodged against the state………………………………………………………….. 43

    Prospective Injunctive Relief……………………………...45

    The Injunctive Relief Sought is Not Against the State…………..46

VII. CONCLUSION.......................................................................................49

VIII. CERTIFICATE OF COMPLIANCE.......................................................50

IX. CERTIFICATE OF SERVICE.................................................................51

X. ADDENDUM ............................................................................................52

# TABLE OF AUTHORITIES

**CASES**

*Bard v. Brown County Ohio*, 970 F. 3rd 738, 748 (6th Cir. 2020) ...........................31

*Barton v. Summers*, 292 F.3rd 944, 949-950, (6th Cir. 2002) ................................48

*Block v. Canepa*, 74 F. 4th 400, 408 (6th Cirt. 2023)........................................ 27, 28

*Bostock v. Clayton Cty. Georgia,* 140 S. Ct. 1731, 1739 (2020) ..........................35

*Burdine*, 450 U.S. at 253..............................................................................29

*Carten v. Kent State University*, 282 F. 3rd. 391, 396 (6th Cir. 2002)............... 45,46

*Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009) .............................34

*Diaz v. Michigan Department of Corrections*, 703 F.3rd 956, 964 (6th Cir. 2013); 45

*Dwyer v. Regan*, 777 F. 2nd. 825, 836 (2nd. Cir. 1986)......................................46

*Elliot v. Hinds*, 796 F.2nd. 298, 301, (7th Cir. 1986).........................................46

*Enbridge Energy LP v. Whitmer*, 135 F. 4th 467, 473 (6th Cir. 2025)............... 46, 47

*Ernst v. Rising*, 427 Fed. 3rd 351, 358, (6th Cir. 2005)......................................44

*Ex parte Young*, 209 US 123, 155-156. (1908) ...................................... passim

*Johnson v. University of Cincinnati,* 212 F.3rd 561, 572 (6th Cir. 2000) ......... 28, 29

*Johnson v. Kroger Co.,* 319 F.3rd. 858, 865 (6th Cir. 2003)..................................28

*Matsushita v. Zenith Radio Corp.*, 475 US 574, 587, (1986)................................28

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802(1973).............................29

*Milliken v. Bradley*, 433 US 267, 289 (1977)....................................................48

*Moderwell v. Cuyahoga County, Ohio*, 987 F.3rd 653, 660....................................42

*Mt Healthy City School District, Board of Education v. Doyle*, 429 US 274, 280, (1977) ....................................................................................................44

*Ondriko v. MGM Grand Detroit*, 689 F. 3rd. 642, 648 (6th. Cir. 2012) ..................30

*Simmond v. Geneva County,* 682 F. 3rd 438 ¶7 ( 6th Cir. 2012)............................27

*T.M. Next Friend of H.C. v. Dewine*, 49 F. 4th 1082, 1093 (6th Cir. 2022).............47

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981) .....................29

*White v. Paul*, 580 US 73, 79 (2017)..............................................................42

*Williams v. Maurer,* 9 F. 4th 416, 436 (6th Cir. 2021) ..................................... 25, 42

**STATUTES**

28 U.S.C. § 1291 ..........................................................................................2

28 U.S.C. § 1331 ..........................................................................................2

42 U.S.C. §1983 ...........................................................................................4

Title VII.......................................................................................... 4, 29, 36

Title IX ...................................................................................................4, 29

**OTHER AUTHORITIES**

https://www.uc.edu/content/dam/refresh/af-62/budget-management/budget-books/FY25%20Budget%20Book%20FINAL_Accessible.pdf...........................48

**RULES**

Fed. Civ. R. 56(a)..................................................................................... 22, 23

**CONSTITUTIONAL PROVISIONS**

Eleventh Amendment................................................................................ 26, 45

iv

## I.    <u>STATEMENT CONCERNING ORAL ARGUMENT</u>

This Court should entertain oral argument in this appeal because it is an exceptionally fact intensive case for which argument of counsel may be helpful in discerning the record.

## II.    <u>JURISDICTIONAL STATEMENT</u>

The District Court properly exercised jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction to review the District Court's final judgment granting Defendants' motion for summary judgment pursuant to 28 U.S.C. § 1291.

### III.   ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred as a matter of law in granting summary judgment in favor of Defendants/Appellees, University of Cincinnati, Kenneth Petren in his individual and official capacities and George Uetz in his individual and official capacities.

2. Whether the District Court erred as a matter of law in failing to draw all reasonable inferences from the factual record in a light most favorable to the non-moving party, (Plaintiff-Appellant, Charlon-Perkins), so as to hold that no finder of fact could come to the conclusion that Defendants' decision to not hire Appellant and to cancel the search for a biological researcher were motivated by considerations of gender.

3. Whether the District Court erred as a matter of law in determining that Defendants-Appellees, Petren and Uetz, are entitled to qualified immunity.

4. Whether the District Court erred as a matter of law in determining that Plaintiff-Appellant, Charlton-Perkins had not presented direct evidence of gender bias.

5. Whether the District Court erred as a matter of law in determining that Plaintiff-Appellant Charlton-Perkins had not presented evidence of pretext to raise a genuine issue of material fact regarding Defendants-Appellees

3

motivation in not hiring him and cancelling the search for a biological researcher.

6. Whether the District Court erred as a matter of law in determining that Plaintiff-Appellant Charlton-Perkins is not entitled to prospective injunctive relief in the form of an award of the position to which he applied and was denied in violation of Title VII, Title IX and 42 U.S.C. §1983.

## IV.    STATEMENT OF THE CASE

### A.  Statement of Facts

### 1.  Charlton-Perkins's Educational and Professional Background.

Mark Charlton-Perkins is a PhD cell biologist and researcher. He spent several years working at the Cincinnati Children's Hospital Medical Center until attending graduate school at the University of Cincinnati and receiving his PhD in Molecular and Developmental Biology in 2014. (Deposition of  Mark Charlton-Perkins ("Charlton-Perkins Dep.") Doc. 27 PageID 151-2). After receiving his PhD., Charlton-Perkins took a position as a Research Associate at the University of Cambridge in the United Kingdom. (*Id*. at PageID 154; Exhibit A, Doc. 27-1, PageID 275).

Because of his work in Cincinnati,  Charlton-Perkins had many professional connections to the University of Cincinnati and the CCHMC biological sciences community and continued to collaborate and communicate with his colleagues in Cincinnati while at Cambridge. (Charlton-Perkins Dep. Doc. 27, PageID 221-4). Specifically, he continued to work with his thesis advisor,  Tiffany Cook, and with Cook's primary collaborator,  Elke Buschbeck. (Charlton-Perkins Dep. Doc. 27, PageID 155); Deposition of George Uetz (Uetz Dep. Doc. 29, PageID 436). In 2017, Buschbeck and  Charlton-Perkins published two papers that they had coauthored.

5

(Charlton-Perkins Dep. Doc. 27, PageID 215; Exhibit A, Doc. 27-1, PageID 275; Uetz Dep. Doc. 29 PageID 436; Deposition of Elke Buschbeck (Buschbeck Dep. Doc. 31, PageID 923). The two are "reasonably good" friends and maintained a friendly social relationship in addition to their collaboration. (Charlton-Perkins Dep. Doc. 27, PageID 210; Buschbeck Dep. Doc. 31, PageID 933)).

**2. The UC Biology Department Job Opening, the Composition of the Committee, and the General Procedure of the Candidate Search Process.**

The Biological Sciences Department is a department of the University of Cincinnati College of Arts and Sciences. The department is an academic unit covered by the University's collective bargaining agreement with its AAUP chapter. (Uetz Dep. Doc. 29, PageID 392-396, 462; Deposition of Bruce Jayne (Jayne Dep. Doc. 45, PageID 1484; Deposition of Margaret Hanson (Hanson Dep. Doc. 47, PageID 1527; Buschbeck Dep. Doc. 31, PageID 795). The Department conducted faculty searches on an annual basis based on their staffing needs. (Uetz Dep. Doc. 29, PageID 402). The Collective Bargaining Agreement terms controlled the department's hiring processes. (Hanson Dep. Doc. 47, PageID 1526-27; Uetz Dep. Doc. 29, PageID 396, 451; Buschbeck Dep. Doc. 31, PageID 795; Deposition of Bruce Jayne ("Jayne Dep") Doc. 45, PageID 1484-5). Per the CBA, "[t]he appointment of a Faculty Member to an Academic Unit shall normally be based on

6

a recommendation initiated within and approved by the Faculty of that Academic Unit using procedures developed within the Academic Unit." (Deposition of Elke Buschbeck (Buschbeck Dep., Doc. 31 PageID 795; Collective Bargaining Agreement §6.2.2, Exhibit 25, Doc. 31-1, PageID 1012, Uetz Dep. Doc. 29, PageID 494).

When a department decides to conduct a faculty search, the Department Head appoints a search committee from the faculty of the department (Uetz. Dep. Doc. 29, PageID 403, 408, 410-411; Petren Dep. Doc. 49, PageID 1565; Buschbeck Dep. Doc. 792-796). The search committee is responsible for conducting the search through each of its phases: drafting the job posting; consulting and liaising with the Office of Equal Opportunity; collecting and reviewing applications; preparing a "short list" of nine to twelve preferred candidates; arranging and conducting multiple rounds of interviews; and ranking the final candidates in order of hiring priority. (Uetz Dep. Doc. 29, PageID 408, 410-411; Buschbeck Dep. Doc. 31, PageID 789-790). When the search committee had identified the preferred candidate for the position, its decision was passed to administration, first to the Department Head, and then to the of the College of Arts and Sciences for final approval. Typically, the administration followed the search committee's decision. (Buschbeck Dep. Doc. 31, PageID 792).

### 3.    The 2017 Cell Biologist Search

In 2017, the University of Cincinnati's Biological Sciences Department identified a need for a new faculty member to teach in the areas of cell biology and cell physiology and initiated a search to hire a new Assistant Professor to fill that role. (Uetz Dep. Doc. 29, PageID 401-404; Exhibit 1, Doc. 29-1, PageID 601). The department sought a cell biologist who could be productive in research and complement the work of existing faculty members working in that area. (Uetz Dep. Doc. 29, PageID 404; Deposition of Dennis Grogan ("Grogan Dep") Doc. 33, PageID 1095).

George Uetz, the Department Head for the Biological Sciences Department, organized a search committee to conduct the search to fill the new position. (Uetz Dep. Doc. 29, PageID 392). Because of the size and breadth of the biological sciences department, an effort was made to select members who had some knowledge of cell biology or who were in similar academic fields. (Buschbeck Dep. Doc. 31, PageID 793.) The search committee was composed of four faculty: Elke Buschbeck as the search committee Chair; Dennis Grogan, who was a full professor and whose academic expertise was similar to cell biology; Josh Gross, who was an associate professor with tenure; Joshua Benoit, who was an assistant professor; and a graduate student, who served as a non-voting member of the committee. (Uetz Dep.

Doc. 29, PageID 406-407; Buschbeck Dep. Doc. 31, PageID 789; Grogan Dep. Doc. 33, PageID 1094-96; Deposition of Joshua Benoit ("Benoit Dep.") Doc. 35, PageID 1150-51; Deposition of Josh Gross ("Gross Dep.") Doc. 39, PageID 1290-91).

**4. Charlton-Perkins' Participation in the Search Process: Preliminary Screening, Skype Interviews.**

The committee was charged with the search on September 13, 2017. (Buschbeck Dep. Doc. 31, PageID 798, Exhibit 3, Doc. 29-3, PageID 634-6). The committee refined and approved the job search advertisement and distributed the posting to nearly a dozen academic associations to find potential candidates. (*Id.*) The job posting was also distributed directly to potential candidates, including former students and collaborators suggested by faculty members. (*Id.*) Among these specific candidates who were suggested was Charlton-Perkins, who Buschbeck contacted by email, inviting him to apply for the Assistant Professor position. (Charlton-Perkins Dep. Doc. 27 PageID 163).

**5. Office of Equal Opportunity, Diversity and Conflict of Interest Concerns.**

On September 18, 2017, the search committee met with Marilyn Kershaw, a representative of the Office of Equal Opportunity ("OEO") who was assigned to the College of Arts and Sciences, and, by extension, the Biological Sciences department. (Deposition of Marilyn Kershaw ("Kershaw Dep.") Doc. 41 PageID 1352). Ms.

Kershaw was responsible for ensuring that the search committee was complying with state, federal, and university laws, regulations, rules, policies and procedures in conducting the search, and if any concerns about the equity or fairness of the search, including conflict-of-interest concerns arose, Ms. Kershaw was the first person after the committee chair to deal with those concerns. (Kershaw Dep., Doc. 41, PageID 1353-4; Uetz Dep. Doc 29, PageID 437; Buschbeck Dep. Doc. 31 PageID 903).

### 6.   Charlton-Perkins' Participation in the Search   Process: Preliminary Screening, Skype Interviews.

At Buschbeck's invitation, Charlton-Perkins submitted his application for the cell biologist position. He made it past the first round of cuts. (Charlton-Perkins Dep. Doc. 27, PageID 165; Exhibit 26, Doc. 31-2, PageID 1017; Exhibit 27, Doc. 27, PageID 1018). Soon thereafter, on December 5, 2017, Charlton-Perkins was notified that he had also made it past the second round of cuts and would be part of the first round of interviews. (MCP Dep. Doc. 27, PageID 169). On December 12, 2017, Charlton-Perkins participated in a Skype interview with the search committee. (MCP Dep. Doc. 27, PageID 170).

At this time, because Charlton-Perkins was among the final dozen candidates, Buschbeck contacted Ms. Kershaw to ensure that her past collaboration with Charlton-Perkins would not create a conflict-of-interest issue. (Buschbeck Dep. Doc. 31, PageID 858-61; Exhibit 3, Doc. 29-3, PageID 639-640). Ms. Kershaw responded

to Buschbeck that: "I would not say that it is a conflict of interest as it can be expected that faculty may know one another in the discipline. Let the committee members know your connection to the candidate and proceed as you would with any other finalist. Thanks." (Buschbeck Dep. Doc. 31, PageID 859-61; Exhibit 3, Doc. 29-3, PageID 639-640).

At Ms. Kershaw's instruction, Buschbeck disclosed to the committee that Charlton-Perkins was a student of her main collaborator, Tiffany Cook, and that the they had collaborated in that capacity. (Buschbeck Dep. Doc. 31, PageID 859; Uetz Dep. Doc. 29, PageID 438-9; Exhibit 3, Doc. 29-3, PageID 639-640). Buschbeck solicited questions or concerns from the committee, but no members of the committee raised any objections or complaints about the collaboration or about Buschbeck continuing the search as the chair. (Buschbeck Dep. Doc. 31, PageID 860, 884). Buschbeck also notified Uetz of her past collaboration with Charlton-Perkins. Uetz did not raise any further objections. (Uetz Dep. Doc. 29, PageID 443-444).

### 7.    Charlton-Perkins Attends On-Site Interviews

On December 18, 2017, the search committee notified Charlton-Perkins that he was among the final five candidates for the Assistant Professorship position and was invited for an on-campus interview. (Charlton-Perkins Dep. Doc. 27, PageID

11

174). Buschbeck provided the CV's and bios of each of the remaining candidates to the faculty. Charlton-Perkins' CV listed his education and work at the University of Cincinnati and his collaborations with Cook and Buschbeck. (Exhibit 27, Doc. 31-3, PageID 1018; Exhibit 28, Doc. 31-4 PageID 1019-23). Buschbeck received feedback on the candidates which indicated a preference for a female candidate, regardless of the relative merit of the other candidates. (Buschbeck Dep. Doc. 31, PageID 837-843, 865—868; *See, e.g.,* Exhibit. 29, Doc. 31-5; PageID 1024; Exhibit 30, Doc. 31-6, PageID 1027-28).

Four of the remaining candidates, including Charlton-Perkins, accepted the committee's invitation to interview in-person. (Buschbeck Dep. Doc. 31, PageID 845-46; 879). The other three candidates who accepted the invitation were a man, Eugene Shirakov, and two women, Orly Levitan and Eve Schneider. The interviews were conducted in late January/early February and consisted of an involved, multi-day program. (Charlton-Perkins Dep. Doc. 27 PageID 174-175; Exhibit 3, Doc. 29-3 PageID 642-43). Candidates attended multiple meetings and interview sessions during which they met with the search committee, the Department Head, members of the faculty and graduate students in the Biology Department. (*Id.*) Candidates also prepared and presented a seminar based on their research during the onsite visit. At the conclusion of each candidate's visit, the faculty were afforded the opportunity to

12

provide comments and feedback on each candidate. (Buschbeck Dep. Doc. 31, PageID 878; Exhibit 3, Doc. 29-3, PageID 643; Uetz Dep. Doc. 29, PageID 461). Charlton-Perkins' on-site interview took place in the first week of February. (Charlton-Perkins Dep. Doc. 27, PageID 174; Exhibit 30, Doc. 31-6, PageID 174-175).

### 8. The Search Committee Votes on the Hiring Priority of the Candidates

After on-site interviews for the four remaining candidates, Buschbeck collected and collated faculty feedback for the interviews, and on February 16, 2018, provided the search committee with copies of the comments about each candidate. (Buschbeck Dep. Doc. 31, PageID 867-879; Exhibit 6, Doc. 29-6, PageID 652-656; Exhibit 34, Doc. 31-10, PageID 1053-1056; Exhibit 35, Doc. 31-11, PageID 1057-1060). Many comments expressed concern about the perceived lack of diversity of the male candidates. (*See e.g.,* Doc. Exhibit 34, Doc. 31-10; PageID 1053-1056; Exhibit 35, Doc. 31-11, PageID 1057-1060). The search committee met on February 21, 2018 to vote on the hiring priority of the remaining four candidates. (Buschbeck Dep. Doc. 31, PageID 871; Exhibit 3, Doc. 29-3, PageID 643-44). Uetz was present during this meeting as an observer. (Buschbeck Dep. Doc. 31, PageID 879-882; Uetz Dep. Doc. 29, PageID 556). Each of the search committee members had selected a different candidate as their top choice for the position and used the meeting to plead

a case for their preferred candidates. (Buschbeck Dep. Doc. 31, PageID 880; Uetz Dep. Doc. 29, PageID 432, 556). During their discussions, it was determined that Shirakov was the least preferred candidate. (Buschbeck Dep. Doc. 31 PageID 880-881). Buschbeck dismissed the committee meeting without conducting the final vote and asked each member to submit their final rankings after due consideration. (Buschbeck Dep. Doc. 31, PageID 881-83).

On February 23, 2018, the search committee members sent Buschbeck their final votes. Three of the committee members ranked Charlton-Perkins at number 1, while the fourth, Gross, ranked Schneider first. (Buschbeck Dep. Doc. 31, PageID 883). Upon receiving the final vote, Buschbeck passed the results of the search committee's deliberations on to Uetz and notified him that the committee had decided with a 3-1 vote that Charlton-Perkins was the final decision of the search committee. (Buschbeck Dep. Doc. 31, PageID 886; Uetz Dep. Doc. 29, PageID 432, 529). Up to this point, no complaints or concerns had been raised to Buschbeck about the conduct of the search, any potential conflicts of interest, or Buschbeck's behavior as the chair of the committee. (Buschbeck Dep. Doc. 31, PageID 885; Uetz Dep. Doc. 29, PageID 510). At this time, Uetz was already aware of Buschbeck's work with Charlton-Perkins and knew that she had cleared this relationship with Mr. Kershaw. (Uetz Dep. Doc. 29, PageID 437).

14

### 9.    Uetz and Ken Petren Make the Decision to Not Hire Charlton-Perkins.

After Buschbeck reported the committee's final 3-1 vote in favor of Charlton Perkins to Uetz, two faculty members, John Layne and Stephanie Rollman approached him to complain that they felt Buschbeck had not conducted a fair search. (Uetz Dep. Doc. 29, PageID 434). Rollman thought that Buschbeck should have recused herself from the search process. (Uetz Dep. Doc. 29, PageID 435). Layne stated that he felt Buschbeck had attempted to bias the search in Charlton-Perkins' favor because they were friends. (Uetz Dep. Doc. 29, PageID 435). Layne had not raised these concerns when he reviewed Charlton-Perkins' CV during the search process, but he did comment that Charlton-Perkins "would not provide much-need increase in diversity. Diversity statement is meh." (Exhibit 30, Doc. 31-6, PageID 1028).

Uetz took the search committee's final decision to Petren on February 27, 2018. (Uetz Dep. Doc. 29, PageID 429). Over two meetings, one on February 27, 2018, and the other on March 2, 2018, the two reviewed the search committee's recommendation, as well as faculty comments, graduate comments, search committee comments, and Uetz's personal notes. (Uetz Dep. Doc. 29, PageID 486). Uetz sought "guidance" on two questions: whether to "advance a female candidate over a male candidate in this circumstance," and what to do about allegations of

15

advocacy for one candidate by the search chair. (Petren Dep. Doc. 49, PageID 1588; Uetz Dep. Doc. 29, PageID 534). Petren recommended that they instead "focus on the two women candidates." (Uetz Dep. Doc. 29, PageID 529; Exhibit 13, Doc. 29-13, PageID 728).

**10. March 8, 2018, Faculty Meeting and the Decision to Cancel the Search.**

After his March 2, 2018 meeting with Petren, Uetz notified the search committee by email that he and Petren would not be following their recommendation to hire Charlton-Perkins:

> Colleagues – After receiving your recommendations, I discussed the candidates and our hiring strategy with the . Based on multiple factors, Ken [Petren] recommended that the most appropriate course of action was to focus on the women candidates first. Given the initial tied rankings and our department's current situation, Ken feels he might be able to make a case to hire two strong women candidates. Since that was also something the committee discussed, and with Ken's support, I think it is worth pursuing that option.
>
> While I can't be certain of the outcome when Ken makes the case to the Provost, I think would be wise to contact Eve Schneider and Orly Levitan to determine their availability and continued interest. Given rumors of potential job offers, we'll need that information to move forward, so I will attempt to contact them this week. (Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 753-54).

Instead of accepting Uetz and Petren's directive to "focus on the women candidates," Buschbeck replied to Uetz on March 5, 2018, questioned why Uetz was "going

16

against the very clear recommendation of the committee," and pushing back against "plain discrimination." (Buschbeck Dep. Doc. 31, PageID 894; Uetz Dep. Doc. 29, PageID Exhibit 19, Doc. 29-19 PageID 753-54). In response, on March 5, 2018, Uetz sent a second email, articulating a six-point explanation for the decision not to follow the search committee's recommendation:

> 1) Search committees are advisory to the head. Your advice and discussion of candidate strength and weaknesses, along with my own judgment and extensive discussions with the , has guided the choice of actions.
>
> 2) The committee's recommendation was not unanimous; one faculty member and the grad student representative both recommended [Eve] Schneider over Charlton-Perkins.
>
> 3) The department faculty responses were mixed, but overall were slightly in favor of Schneider, who had the highest average score, the most top scores, and the least lowest scores. Both female candidates had higher average scores than Charlton-Perkins.
>
> 4) Position offers are made by the , and the head must make the case for a specific candidate, after review and discussion of the entire search procedure.
>
> 5) When candidates are equally qualified – which everyone agreed upon, even though each of you had a different initial preference-the head would need to make the case why a male candidate should be hired over a qualified female candidate. In this situation, to choose a female candidate over a male is not illegal, as Elke [Buschbeck] assets.
>
> 6) After extensive review and discussion (two meetings, a phone call and several emails), Ken and I felt it best to pursues one or both of the female candidates. Given the pros and cons of their interviews, we decided upon Schneider as a first choice. (Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 752-53).

17

After  Buschbeck responded and challenged  Uetz's assertion that the committee had ranked the candidates as equally qualified, ("A 3 out of 4 support among the faculty committee members is actually a very clear recommendation."),  Petren offered to meet with  Buschbeck to discuss: "I can offer to discuss more if you think it would help. I don't want you to think this is just George behind this decision." (Uetz Dep. Doc. 29, PageID 559-61; Exhibit 19, Doc. 29-19 PageID 749-750). The same day Uetz spoke with  Buschbeck in the faculty office and told her for the first time that he had received concerns about how she had conducted the search. (Buschbeck Dep. Doc. 31, PageID 899).  Buschbeck addressed the concerns the following day at a faculty meeting and assured the department that she had spoken with Marilyn Kershaw about her collaboration with  Charlton-Perkins. (*Id.,* Exhibit 17, Doc. 29-17, PageID 740).

On March 8, 2018,  Buschbeck met with  Petren and Associate  Margaret Hanson  to further discuss the search.   Buschbeck recorded her notes of the conversation the following day on March 9, 2018. (Buschbeck Dep. Doc. 31, PageID 904-5; Exhibit 39, Doc. 31-15, PageID 1064).  Buschbeck assured  Petren that she had closely followed Ms. Kershaw's instructions to avoid a conflict of interest ("COI"). (Buschbeck Dep. Doc. 31, PageID 902-4; Exhibit 39, Doc. 31-15, PageID 1064).  Petren told her that it did not matter, because there was a "perceived" conflict

of interest and said that this was "one of the reasons" he decided not follow the search committee's vote. (Buschbeck Dep. Doc. 31, PageID 902-5; Exhibit 39, Doc. 31-15, PageID 1064-5.).  Petren told  Buschbeck that the other reasons were that the "candidates are very close, and since Biology is short on women, that he thought that it would be better to go with a female candidate." (*Id.*)  Petren did not remember which of the two female candidates would be offered the job, in part because he "has not yet really looked at their CV very closely, and that he intended to do that at a later time." (Buschbeck Dep. Doc. 31, PageID 902-4; Exhibit 39, Doc. 31-15, PageID 1065).

### 11.    March 20, 2018, Faculty Meeting and the Decision to Cancel the Search.

On March 20, 2018,  Petren and  Uetz met with the Biology Department and informed the department that the job search was cancelled, citing the fact that Buschbeck had publications with  Charlton-Perkins. (Uetz Dep. Doc. 29, PageID 482, 528; Exhibit 7, Doc. 29-7, PageID 658-9).  Petren's announcement was met with confusion by the staff. Multiple faculty members voiced surprise and confusion at both the decision to cancel the search and Petren's claimed rationale for doing so. (Exhibit 7, Doc. 29-7, PageID 660, 61, 664) ("No. But by accepting what she—Elke did the right thing, to approach your office; a member of your office gave her the green light to go ahead with it.  Why don't you take responsibility and say I support

19

the people that work in my office and I'm going to stand by my office and let the search go ahead?"); *Id.* at 670. ("If It's –If it's possible for one department to have co-authors and no problem, then it seems ludicrous that we have to cancel a search because of that. And it was absolutely clear for anyone who read the CVs of the four candidates, absolutely clear. I mean, this person's from Children's Hospital here in Cincinnati. It was absolutely clear to anyone who read these things that Elke had published. This was not secretive at all. Way open, okay." )

When questioned on the decision-making process, Uetz explained that he and Petren reviewed the search committee's 3-1 recommendation, "And I mentioned – I -I asked specifically, in particular, here we have a male candidate who was recommended by the search committee. And very close behind we have two, two female candidates. And I need guidance on what do you do with that? Because our department is bereft of female candidates. Do I advance a female candidate over a male candidate in this circumstance? And Ken and I talked about it." (Exhibit 7, Doc. 29-7, PageID. 660)

Ultimately, despite the objections of the faculty, Petren and Uetz rejected the proposals to cure the alleged bias in the search and stood firm in their decision to cancel the search. Uetz notified Charlton-Perkins that they had decided to cancel

20

the search on March 27, 2018, a week after the faculty meeting. (Doc. 27 PageID 184, Ex. J, Doc. 27-10 PageID 303).

### B.    Procedural Posture

Charlton Perkins filed his initial complaint against the University of Cincinnati; Kenneth Petren, in his official and individual capacities; and George Uetz, in his official and individual capacities on March 2, 2020, (Doc. 1).  The complaint was amended on May 12, 2020 (Doc. 8).  On May 21, 2020, Defendants filed a motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim (Doc. 9), on August 24, 2021, the District Court granted the motion to dismiss without prejudice (Doc. 12).

On September 14, 2021, Charlton Perkins filed a Notice of Appeal of the District Court's judgment dismissing the case (Doc. 14).  On June 6, 2022, this Court entered a judgment ordering that the judgment of the District Court dismissing the case be reversed and remanded for further proceedings (Doc. 13).  Following remand the District Court issued a new calendar order on October 12, 2022. (Doc. 21) On November 3, 2023, Defendants filed a motion for summary judgment (Doc. 50).  That motion was granted by the District Court on August 18, 2025 (Doc. 55).  On September 4, 2025, Charlton-Perkins filed a timely Notice of Appeal of the Judgment and Order dismissing his case (Doc. 58).

21

## V.   SUMMARY OF THE ARGUMENT

Mr. Charlton Perkins is asking this Court to reverse the District Court's decision and allow his case to proceed to a trial on the merits against all defendants. The thrust of the appeal is that in granting summary judgment in favor of defendants, the District Court ignored a bedrock principle of Rule 56 jurisprudence; namely, that once the parties present evidence, the court's function in ruling on a motion for summary judgement is not to weigh the evidence, and determine the truth of the matter, but to determine whether there is genuine issue for trial.  Fed. Civ. R. 56(a). It is axiomatic that in determining whether there exists  a genuine issue for trial, the court must draw all inferences in the light most favorable to the non-moving party. Here, the District Court stood these principles on their head.

The fact record in this case is noteworthy for the comments by and between Petren and Uetz which illuminate gender laden reasons behind their decisions to reject the recommendation of the search committee to hire Charlton-Perkins and the ensuing decision to cancel the search in its entirety.  By way of illustration, Uetz directly inquired of Petren whether the former should advance female candidates over a male candidate.  (Doc 29, PageID 490).  And, in another instance, Uetz candidly explained that he and Petren had decided to, "focus on the women candidates".  (Doc 29, PageID 560).  By way of further explanation, Uetz acknowledged that, "Ken and I felt it best to pursue one or both of the female

22

candidates." (Doc. 29-19, Ex. 19, PageId 750).  And, if that is not enough to shed light on the considerations that led the decisions affecting Charlton-Perkins, when asked at his deposition the extent to which consideration of gender balance influenced the decision of who was the appropriate candidate to be hired, Uetz was crystal clear, "It (gender) was in the mix. (Doc 29, PageID 535.  Petren was equally transparent when communicating with the Search Committee Head, Elke Buschback, that "since Biology is short on women, he thought if would be better to go with a female candidate."  (Doc 31-15, PageID 1064).

Despite this evidence, bearing on the issue of motivation, whether direct or circumstantial in nature, the District Court abandoned any pretense of giving the non-moving party the benefit of all inferences from the facts.  Instead, the District Court seemingly adopted a willingness "to suspend its ability to disbelieve" the fulsome evidence that both Petren and Uetz, if not consumed by, were at the least concerned with, the gender of the individual to whom they would offer the position. To circumvent the mandate of Rule 56 affording Charlton-Perkins the benefit of all inferences from the statements of Petren and Uetz, the District Court employed a dialectic of sorts that was selective in its facts and universally one-sided in favor of the moving party when it came to inferences drawn from those facts.  After cataloging and organizing the facts in a fashion to support its predetermined decision

23

to grant summary judgment in favor of Defendants, (See Doc. 55, PageID 1741-1743) the District Court summed up the case as follows, "[I]n short, there is ample evidence in the record to support Defendant's articulated basis for cancelling the search and for never awarding the position." (Doc. 55, PageID 1743). And, in further explanation noted that, "Plaintiff failed to cite to any instance in which Petren expressed a sentiment that could be construed as discriminatory." (Doc. 55 PageID 1744). Charlton-Perkins respectfully submits that the District Court's analysis of the factual record was altogether incompatible with the principles governing Rule 56 motions. On this basis alone, reversal of the judgment in favor of Defendants is warranted.

In addition to the overriding issue of whether the District Court erred in its Rule 56 analysis, other important issues are bound up in this appeal. The first is whether the District Court's decision granting qualified immunity to the individual Defendants on the equal protection claim was appropriate. There is no dispute that reverse discrimination by a state actor on account of gender is unconstitutional. However, the District Court held that qualified immunity for Petren and Uetz was warranted because it has not been clearly established by case precedent that stopping and then cancelling a search for an advertised position in a public educational institution after allegations of gender discrimination are raised constitutes an

24

unconstitutional action(s).  Doc. 55.  PageID 1731.  As the District Court noted, "there does not appear to be any caselaw to answer the question in the affirmative." (Id.)  However, the District Court's terse analysis of what constitutes the governing standard for "clearly established" was unreasonably narrow and circumscribed. While the gold standard for the clearly established criterion for governmental immunity is caselaw developed from the same or very similar facts, an exact case precedent or any case precedent for that matter, is not an absolute or inflexible requirement to deny qualified immunity.  The overriding consideration in a qualified immunity context is whether an objectively reasonable government official understood or should have understood that the actions in question constituted a constitutional violation.  Indeed, in this Circuit, "there can be the rare 'obvious case' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Williams v. Maurer*, 9 F. 4th 416, 437 (6th Cir. 2021).  This is such a case.

The individual Defendants openly and candidly discussed that if they rejected the recommendation of the search committee that Charlton-Perkins be hired, they faced the real possibility that they and the University would be sued for discrimination.  Doc. 49, PageID 1582-1584.  The point here is that these officials were plainly aware that by favoring or disfavoring a candidate for a position based

25

on gender is an event of constitutional magnitude.  In a situation such as this, a specific case authority may be unnecessary to defeat a defense based on qualified immunity.  It is hard to argue that an objective supervisor in a public academic institution would not be aware that granting or denying a position based on gender would not run afoul of equal protection considerations.

The final issue on this appeal emerges from the decision of the District Court to reject out of hand Charlton-Perkins's demand for prospective injunctive relief in the form of "instatement" into the position he was denied due to consideration of his gender.  The District Court held that the relief sought against the individual defendants in their official capacities did not fall within the *Ex parte Young* exception to Eleventh Amendment immunity, because allowing such would require the state of Ohio to "create and fully fund a new position just for the Plaintiff." (Doc. 55 PageID 1728).  The District Court's explanation for its decision suggests that it may have conflated or confused Charlton-Perkins's demand for prospective injunctive relief as one for damages due to "a monetary loss resulting from a party's breach of a legal duty on the part of the state official." (Doc. 55, PageID 1729) Furthermore, according to the District Court, there "is no continuing violation to enjoin." *Id*.  But that is not true.

26

Assuming for argument sake that Charlton-Perkins was denied the position in question for discriminatory reasons, he has suffered and may continue to suffer continuing violations of his constitutional and statutory rights until the violation is cured and he is granted relief by his installation into the position he was improperly denied. Therefore, to the extent there remains a question of whether Charlton-Perkins is entitled to prospective injunctive relief, a hearing can be held to determine whether the violation of his rights is a continuing one.

## VI.  ARGUMENT

### A.  <u>Standard of Review</u>

1. The standard of review of decisions denying or granting summary judgment is *de novo*, *Block v. Canepa*, 74 F. 4th 400, 408, (6th Cir. 2023);

2. The Court of Appeals reviews the grant of summary judgment on the grounds of qualified immunity *de novo, Simmond v. Geneva County,* 682 F. 3rd 438 ¶7 ( 6th Cir. 2012);

3. The Court of Appeals reviews the question of Eleventh Amendment Immunity *de novo*, *Block v. Canepa*, 74 F.4th 400, 408, (6th Cir. 2023);

### B.  <u>The District Court Erred In Deciding The Facts And Drawing All Inferences From The Record In A Light Most Favorable To Defendants.</u>

27

Among the guiding principles of Rule 56 jurisprudence is that "[O]nce the parties present evidence, the Court's 'function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial'". *Block v. Canepa*, 74 F. 4th 400, 408 (6th Cirt. 2023). In making that determination the Court must draw all inferences in the light most favorable to the non-moving party. *Id.* citing to *Matsushita v. Zenith Radio Corp.*, 475 US 574, 587, (1986). "However, the 'mere existence of a scintilla of evidence in support of the [non-moving parties'] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the non-moving party". *Id.*

These guidelines apply to the District Court's analysis of Charlton-Perkins's discrete claims of discrimination under the constitution (equal protection), Title VII and Title IX. In such cases, "a Plaintiff may establish a claim of discrimination by introducing direct evidence of discrimination or providing circumstantial evidence which would provide an inference of discrimination. J*ohnson v. University of Cincinnati,* 212 F.3rd 561, 572 (6th Cir. 2000). "[D]irect evidence is that evidence if believed, requires the conclusion that the unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.,* 319 F.3rd. 858, 865 (6th Cir. 2003). "Where a plaintiff presents direct evidence of discriminatory

28

intent in connection with a challenged employment action, the burden of both production and persuasion shifts to the employer to prove that it would have taken the same action, even if it had not been motivated by impermissible discrimination." *Id.* Conversely, if a plaintiff relies on circumstantial evidence of discrimination, the Court applies the "*McDonnell Douglas* burden-shifting approach" to evaluate the allegations. *Johnson*, 212 F.3d at 572; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792(1973). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff successfully makes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. Finally, if the defendant carries its burden, the burden shifts back to the plaintiff to provide evidence that the defendant's stated reasons are a pretext. *Burdine*, 450 U.S. at 253.

### Direct Evidence

While Charlton-Perkins concedes that not every relevant statement by Petren and/or Uetz concerning the gender identity of the candidates constitutes direct evidence of discrimination, the District Court ignored statements that plainly establish that the concern for gender balance in the department was, at the least, a

29

motivating factor in the decision of which candidate to select.  At his deposition, Uetz testified unequivocally that gender was, **"in the mix"** of what led to the decision of who was selected for the position, (Doc. 29, PageID 535).  Therefore, this is unmistakably evidence which, "if believed, requires the conclusion that unlawful discrimination was, at the least, a motiving factor in the employer's decision", See *Ondriko v. MGM Grand Detroit*, 689 F. 3rd. 642, 648 (6th. Cir. 2012).  One does not have to infer that gender was a motivating factor in the selection of a female candidate over Charlton-Perkins;  Uetz stated as much directly.  Yet, the District Court assigned no weight to this evidence.  This excerpt from Uetz's deposition is sufficient in itself to allow a jury to weigh in on the question of whether gender was a motivating factor of the action in question.

Additional statements by the individual defendants provided further direct evidence that gender was necessarily a factor in the selection process without need to draw inferences to establish that fact.  By way of further example, Uetz informed Buschback that, "Ken and I felt it best to pursue one or both of the female candidates".   (Uetz Depo., Doc. 29, PageID 559-561, Ex. 19, Doc. 29-19, PageId 751-753.)  Similarly, Petren stated to Buschback that, "Since Biology is short on women, that he thought it would be better to go with a female candidate."   (Doc.

30

31-15, Ex. 39, PageID 1064).  These statements provide further direct evidence that gender was a factor in the selection of a candidate.

**Circumstantial Evidence**

In addition to direct evidence, the record is rife with circumstantial evidence from which a jury could find for Charlton-Perkins.  "Circumstantial evidence may be sufficient to carry the burden but in considering a summary judgment, the Courts, "may—inquire into the plausibility of circumstantial evidence." *Bard v. Brown County Ohio*, 970 F. 3rd 738, 748 (6th Cir. 2020).  In considering the plausibility of this evidence it is important to note that the faculty search in question took place in a context where the Biology Sciences Department had recently experienced a "mass exodus," of female tenure track professors and therefore was deeply invested in hiring a female candidate, regardless of the credentials of the male candidates.  Thus, added to the explicit admissions of the decision makers (Petren and Uetz) as to their preferred gender of the candidate selected, was feedback from several of the faculty members reflecting that their clear preference was that one of the females be selected:

- Jayne "strongly favor[ed] giving the nod to a female applicant given the recent mass exodus we have had of tenure-track women in our department in tenure-track position." (Doc. 29-6, PageID 654).

31

- Layne criticized Charlton-Perkins: "would not provide much-need increase in diversity. Diversity statement is meh." (Exhibit 30, PageID 31-6, PageID 1028).

- Stephen Matter did not even consider the male candidates, noting in his comments next to each male candidate simply, "male," and commenting "I don't think we could in any good conscious, [sic] make an offer to a white male over any female qualified candidate given the current gender bias in our department. . ." (Doc. 31, PageID 838; Doc. 31-5, Ex. 29, PageID 1024).

It is clear from these statements in the record that certain faculty in the Biological Sciences Department were invested in the possibility of hiring a female candidate over the male. Simply stated, the circumstantial evidence that gender preference played an outsized role as to who would and would not be appointed based on considerations of their gender allow for the inference that the decision to stop the search was made purposefully to prevent a male from holding the position. The appearance of gender bias is the inevitable byproduct of the search process manipulated by Petren and Uetz.

It is no less clear that the decision to cancel the search was made to avoid potential liability for discrimination after disregarding the search committee's

32

decision in favor of Charlton-Perkins. During the faculty meeting announcing the cancellation, Petren explained:

> KEN PETREN: Well, so –so were we. We were trying to say, let's – let's make an offer to someone. And then, frankly, the emails just started flying with a lot of accusations that can't be undone. And here's what happens, just so you guys know. [] Anyone in the search, let's say we offer Candidate A or B or C, whoever is not offered or anyone here that disagreed with one or the other or the other, any of these candidates could come back and – and file a lawsuit. And this happens all the time. You know, we settled one for about 250,000 in A&S. Couple months ago it was 120,000. They could come back and have a treasure trove of evidence to march out in front of – of a jury. We had a jury trial – two weeks ago."

(Exhibit 7, Doc. 29-7, PageID 664; Petren Dep. Doc. 49, PageID 1582-84). The evidence that the search was cancelled to avoid liability could not be more explicit.

Petren raised a concern about being sued as early as the March 8, 2018 meeting with Buschbeck: "He [Petren] further said that if there was an investigation, that then they would have to go through my email and 'who knows what they would find there.'" (Exhibit 39, Doc. 31-15, PageID 1064). A jury could conclude from this evidence that Uetz and Petren were highly concerned about their potential liability and seemingly uncomfortably aware that an investigation might unearth evidence—such as Uetz and Buschbeck's emails— that suggested they had acted discriminatorily. In these circumstances, it is not

33

implausible for a reasonable jury to conclude that the decision to cancel the search in its entirety was made purposefully to conceal the discriminatory reason for which the search was discontinued before an appointment was made.

## Pretext

When the employee has satisfied his *prima facie* case, or produced direct evidence of discrimination, the burden shifts to the employer to proffer a legitimate non-discriminatory reason for the adverse employment action, and then shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009). In the Sixth Circuit, a plaintiff generally may do so by showing: " 1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* However, "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* at FN4.

According to Defendants, the decisions to not hire Charlton-Perkins and to cancel the position were forced upon them by a conflict-of-interest-tainted search and a schism within the department. But the record does not support that version of events. Instead, it shows that concerns about gender predominated

34

Defendants' decision not to hire the male candidate, Charlton-Perkins, and to cancel the search entirely to mask their discrimination..

And even if Defendants could plausibly demonstrate that consideration over COI was factored into their decisions, the law of Title VII nevertheless remains in play: "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff 's gender was one but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton Cty. Georgia,* 140 S. Ct. 1731, 1739 (2020). There is ample evidence in the record from which a jury could conclude that even if a COI was a legitimate concern, Charlton-Perkins' gender was the proverbial straw that broke the camel's back in Defendants' decision not to hire him.

### i.    Concerns about Gender Predominated the search.

Despite Defendants' arguments to the contrary, the record is replete with evidence that the gender of the candidates was a significant concern of the decisionmakers and the faculty. As discussed at length in the direct evidence section *supra*, concerns about gender predominated the search from the outset. The record shows that the gender of the candidates was a concern of Uetz and department member as early as October 2017, when Uetz discussed an

35

underutilization of female faculty in the Biology Department. (Uetz Dep. Doc. 29, PageID 446; Exhibit 4, Doc. 29-4, PageID 647; Deposition of Margaret Hanson, Doc. 47, PageID 1526, 1529-30).

It bears emphasizing that concerns about COI was not a matter of serious discussion in the department until after the search committee voted to hire Charlton-Perkins.  Only then did the Defendants' focus shift from hiring solely one candidate, to the consideration of hiring two female candidates. When Uetz deliberated with Petren about "advance[ing] a female candidate over a male candidate in this circumstance," it was explicitly in the context of a department "bereft of female candidates." (Petren Dep. Doc. 49, PageID 1588; Uetz Dep. Doc. 29, PageID 534). And when Uetz wrote the search committee on March 4, 2018, he told them to "focus on the women candidates first," and that "[g]iven the initial tied rankings and our department's current situation, Ken feels he might be able to make a case to hire two strong women candidates." (Exhibit 19 *email dated 3/4/2018*, Doc. 29-19, PageID 753).  To this point there was no serious discussion of whether a COI or bias in favor of Charlton-Perkins had tainted the search process. But then, when  Buschbeck objected to Uetz and Petren's rejection of the committee's decision and called it discriminatory,

36

(Doc. 29-19, Ex. 19 *email dated 3/5/2018*, PageId 753) Defendants raised COI issues.

### ii.    Conflict of Interest was not a legitimate concern.

The conflict-of-interest justification cited by Defendants has no basis in fact. Defendants argue that they refused to hire Charlton-Perkins and cancelled the search because   Buschbeck unfairly biased the search in Charlton-Perkins' favor, and because faculty perceived a conflict of interest. A jury could readily disbelieve this argument based on the unremarkable nature of Buschbeck's collaboration with  Charlton-Perkins, which was vastly insufficient to justify their actions.

Buschbeck's past collaboration with  Charlton-Perkins was not unusual in academic circles. Collaboration among academics in a particular scientific field is expected due to the narrowness of fields of study and the desire to have field-experts on the search committee. (Kershaw Dep. Doc. 41, PageID 1377; Benoit Dep. Doc. 35, PageID 1165; Uetz Dep. Doc. 29, PageID 441; Buschbeck Dep. Doc. 31, PageID 853). Indeed, in a very recent search, which resulted in a faculty member's hiring ( Annie Rowe), a search committee member not only knew  Rowe personally but not long before had co-authored a paper with

37

the second ranked candidate. (Buschbeck Dep. Doc. 31, PageID 852). No objection was perceived, and the search was completed without controversy.

Here, not only was there a post-hoc concern with a supposed COI, but the record demonstrates that Buschbeck had acted responsibly and transparently by contacting the OEO and Marilyn Kershaw, who by all accounts was the proper individual, whom Buschbeck was expected to rely upon for direction in these circumstances. (Uetz Dep. Doc. 29, PageID 441; Jayne Dep. Doc. 45, PageID 1462). Buschbeck did not break any rule, regulation or procedure, or otherwise unfairly favor Charlton-Perkins. (Buschbeck Dep. Doc. 31, PageID 907; Exhibit 7, Doc. 29-7, PageID 669) ( Uetz stated in the faculty meeting that he "did not observe any conflict on Elke's part. And I, you know, I – and, as far as I'm concerned, her going to Marilyn for advice seemed appropriate, you know.")

Notably, the two most significant voices of criticism toward Buschbeck's management of the search, Drs. Layne and Jayne, "strongly favor[ed] giving the nod to a female applicant given the recent mass exodus we have had of tenure-track women in our department in tenure-track position." (Doc. 29-6, PageID 654). Layne criticized Charlton-Perkins whom he said "would not provide much-need increase in diversity. Diversity statement is meh." (Exhibit 30, PageID 31-6, PageID 1028). Defendants cite six alleged

38

complaints about the potential bias of the search. However, evidence of these complaints is secondhand and insubstantial. Although Jayne claimed that he was "stubborn and persistent" in bringing multiple complaints of malfeasance by Buschbeck to the attention of Uetz and Petren, when pressed in his deposition, he could not recall a single instance when he allegedly did so. (Jayne Dep. Doc. 45, PageID 1460-65).

Defendants allude to a "schism" in the department over Buschbeck's conduct of the search, but there is scant evidence in the record that any concern about a COI existed before the search committee made a recommendation to hire Charlton-Perkins. The only substantive evidence of a dispute within the department is that concerning Buschbeck's challenge to what she considered to be unfair and discriminatory decision making. On the entirely of the record, a jury could readily disbelieve Defendants' argument that a conflict of interest, real or perceived, motivated their decision to deny Charlton-Perkins the position and then cancel the search.

### iii. The Decision to Disregard the Recommendation of the Committee and Cancel the Search was Highly Irregular.

Finally, a jury could find that Defendants' claimed conflict of interest was insufficient to motivate the decision to refuse to hire Charlton Perkins and

39

to cancel the search. The decision to disregard the search committee's recommendation was highly unusual (Buschbeck Dep. Doc. 31, PageID 898), as was the decision to cancel the search, which meant significant wasted time, energy, and opportunity. (Kershaw Dep. Doc. 40 PageID 1355; Petren Dep. Doc. 49, PageID 1574, 1578; Benoit Dep. Doc. 35 PageID 1152).  In fact, it is not even clear that the CBA permits the hiring administrators to reject the committee's hiring decision. (Buschbeck Dep. Doc. 31 PageID 795; Collective Bargaining Agreement §6.2.2, Exhibit 25, Doc. 31-1, PageID 1012, Uetz Dep. Doc. 29, PageID 494).  Moreover, there  remains  no explanation why the alleged taint of bias could not have been cured short of cancelling the search. For example, Buschbeck offered to step aside, and submit a re-vote of the committee. (Buschbeck Dep. Doc. 31, PageID 975-76; Uetz Dep. Doc. 29, PageID 539). Furthermore, Defendants never attempted either to redo the search or amend the process to eliminate any flaws or shortcomings before pulling the plug on the entire enterprise.

Perhaps the most plausible explanation for Defendants' actions, which a reasonable jury could readily adopt, is that because Buschbeck had already complained about gender discrimination via discoverable emails, the  search could not be completed in any form without exposing Defendants to potential

40

liability. (*See, e.g.,* Exhibit 7, Doc. 29-7, PageID 664; Petren Dep. Doc. 49, PageID 1582-84)(" any of these candidates could come back and – and file a lawsuit. And this happens all the time. You know, we settled one for about $250,000 in A&S. Couple months ago it was $120,000. They could come back and have a treasure trove of evidence to march out in front of – of a jury.")

On this record, a jury could readily disbelieve Defendants' pretextual reason for their decisions not to hire Charlton-Perkins and cancel the search. Indeed, a jury could find instead that Defendants made these decisions out of a discriminatory desire to hire a woman instead of a man and then cancelled the search in order to conceal their discriminatory motives.

**C.** **The District Court erred in finding that the constitutional violations by Petren and Uetz were not clearly established so as to strip them of qualified immunity for stopping and then cancelling the search.**

In its opinion granting summary judgment in favor of Defendants and dismissing Charlton-Perkins's arguments countering Uetz's and Petren's claims for qualified immunity, the District Court posited that the question here is, "whether it is a clearly established constitutional violation to stop and ultimately cancel a contentious hiring process after allegations of gender discrimination are raised." (Doc. 55, PageID 1731-1732.) According to the District Court, qualified immunity is appropriate in this circumstance because, "Plaintiff has not met its burden to show

41

the violation of a clearly established constitutional right." (Id.) The District Court's reasoning was premised on the failure of Charlton-Perkins to provide any citation to caselaw that answers the District Court's rhetorical question in the affirmative. However, the clearly established criterion for qualified immunity is not as rigid or circumscribed as the District Court suggests.

The fact that a specific case precedent based on the same or similar facts to those presented here does not exist is not the end to the analysis of whether a constitutional point has been clearly established. The bottom line, so to speak, is that the Supreme Court does not require a case directly on point "for a right to be clearly established". *White v. Paul*, 580 US 73, 79 (2017). And, in this Circuit, "there can be the rare 'obvious case' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Williams v. Maurer,* 9 F. 4th 416, 436 (6th Cir. 2021); See also, *Moderwell v. Cuyahoga County, Ohio*, 987 F.3rd 653, 660. ("The 'clearly established' standard also requires the legal principle clearly prohibit the officers' conduct in the particular circumstances before him.") This is that rare case where the constitutional violation was or should have been so obvious to a reasonable university official.

42

A public official holding the position of department chair or department head should have been aware that gender bias in a public university setting is a matter of constitutional magnitude. If the record in this case establishes anything of certainty, it is that Petren and Uetz were consumed with whether they were treading on constitutional thin ice when they were deciding whether they should focus on the two females rather than offer the position to Charlton-Perkins which had been the final and official recommendation of the search committee. They even spoke about the prospects for litigation.

In these circumstances, the contours of the constitutional right against gender discrimination infecting the search process were manifest. However, the District Court placed no particular attention to the circumstances attendant the decisions challenged in this lawsuit. It was error, therefore, for the District Court to grant qualified immunity to Petren and Uetz merely because a case precedent could not be located. It was enough that the contours of discrimination law, including those of reverse gender discrimination, were sufficiently well established in academic communities that the District Court should have rejected qualified immunity in these circumstances as a matter of law.

D. **The District Court erred in holding that Charlton-Perkins' demand for injunctive relief against the individual defendants in their official capacities is barred by the Eleventh Amendment**

43

**because the relief sought is prospective in nature and not lodged against the state.**

The State's Eleventh Amendment sovereign immunity applies to actions against state officials sued in their official capacity for money damages. *Ernst v. Rising*, 427 Fed. 3rd 351, 358, (6th Cir. 2005).  However, "the States' federal court immunity comes with a host of exceptions." *Id*.  For example, the immunity does not attach if the lawsuit is not against the state or an "arm of the state', *Id.,* citing to *Mt. Healthy City School District, Board of Education v. Doyle*, 429 US 274, 280, (1977).  Immunity also does not apply, "if the lawsuit is filed against a state official for purely injunctive relief enjoining the official from violating federal law".  *Id*. citing to *Ex parte Young*, 209 US 123, 155-156. (1908).  Here, the District Court held that Charlton-Perkins' claim was, in effect, filed against the State for monetary damages and not brought primarily to obtain injunctive relief prohibiting the individual defendants or their successor or assigns[1] from continuing to deny Charlton-Perkins the equal protection of the laws under the 14th Amendment.  The District Court's reading of the complaint was misguided and inconsistent with Circuit precedent in similar circumstances.

---

[1] Charlton-Perkins' claim for prospective injunctive relief is directed to "Defendants, their successors and assigns", to instate him into the assistant research position he was denied along with the attendant benefits he would have received had the search not been aborted.

44

**Prospective Injunctive Relief**

It is clearly established that in order to fall within the *Ex parte Young* exception to Eleventh Amendment immunity, a "claim must seek prospective relief to end a continuing violation of federal law." *Diaz v. Michigan Department of Corrections*, 703 F.3rd 956, 964 (6th Cir. 2013); *Carten v. Kent State University*, 282 F. 3rd. 391, 396 (6th Cir. 2002)  ("However, this Court has previously has held that claims for reinstatement are prospective in nature and appropriate subjects for *Ex parte Young* actions." )

The injunctive relief sought by Charlton-Perkins is inherently prospective in nature.  He is not seeking monetary relief from the individual defendants in their official capacities; rather, he is asking for a court order directing the individual defendants in their official capacities to instate, install, place, insert, or, by whatever verb is most appropriate, take such action as will prevent Defendants from continuing to violate Charlton-Perkins' constitutional rights by not awarding him the position to which he is entitled.  If there is a material distinction for practical purposes between "instatement" or a "reinstatement" into the position, that distinction is one without a difference for purposes of this case.  Indeed, the clear purpose of the injunction is to place Charlton-Perkins in a position he does not now hold and by so doing cure or put an end to Defendants' violation of federal law.  This

45

is not a novel concept or holding. Other circuits have specifically held that claims for reinstatement for violations that continue during the period the plaintiff is excluded from the benefit to which he is entitled are appropriate, See *Carten v. Kent State*, 282 F. 3rd. at 396, citing to *Elliot v. Hinds*, 796 F.2nd. 298, 301, (7th Cir. 1986); See also, *Dwyer v. Regan*, 777 F. 2nd. 825, 836 (2nd. Cir. 1986).

In this Circuit "[T]o determine whether a federal suit against a state official falls within the *Ex parte Young* doctrine – a court ordinarily need only conduct a straight forward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective; if the complaint satisfies the two requirements - an allegation of a present violation of federal law and a request for prospective relief, the court ordinarily concludes that *Ex parte Young* applies. *Enbridge Energy LP v. Whitmer*, 135 F. 4th 467, 473 (6th Cir. 2025). Charlton-Perkins' complaint satisfies these requirements.

### The Injunctive Relief Sought is Not Against the State

The District Court considered the prospective relief aspect of the complaint as a claim against the State itself. According to the District Court's analysis, the "relief plaintiff seeks would require the University of Cincinnati (a public institution) **to create and fully fund a new position just for Plaintiff.")** (Doc. 55, PageID 1728) (emphasis in original). However, the District Court's position is not supported by

46

any record evidence to demonstrate that the injunctive relief would have any more impact on the state's treasury than a typical order for reinstatement would. Indeed, the Supreme Court (*Ex parte Young*) instructs that a court examine the, "effect of the relief sought." *Enbridge*, 135 F. 4th. 473. Unquestionably, a court may require a state official to cease his unlawful conduct when a "complaint alleges a violation of federal law and seeks relief properly characterized as prospective." *T.M. Next Friend of H.C. v. Dewine*, 49 F. 4th 1082, 1093 (6th Cir. 2022). Yet, the question of whether this suit was brought primarily to obtain monetary damages or to vindicate a federal or constitutional right was never directly addressed by the District Court. Doing so would have required the District Court to have considered, "how *Ex parte Young* plays out in practice." *Id*. As noted previously, the District Court opinion supposes that the relief sought by Charlton-Perkins would require the university to create and fully fund a position just for him. But the record evidence provides no such evidence. It remains to be determined whether and, if so, how the requested relief is conditioned upon the provision of funds from the State Treasury.[2] It is a matter of public record that as a public research institution, the University of Cincinnati is a recipient of funds from a myriad of sources e.g., grants, contracts,

---

[2] The District Court noted in a footnote the limited authority of the University's Board of Trustees the availability and compensation of a faculty position. (Doc. 55, Page ID 1728). However, nothing in that citation addresses the issue of the source of funding for the faculty position or the amount of compensation fixed by the Board.

47

donations, fees, and tuitions, none of which are from the State Treasury. See

https://www.uc.edu/content/dam/refresh/af-62/budget-management/budget-books/FY25%20Budget%20Book%20FINAL_Accessible.pdf . So, there is no certainty that the State's Treasury would be affected if Charlton Perkins is placed on the payroll. Apparently the District Court took no account for this reality.

This Court has instructed that, "[i]f the injunctive relief sought by the plaintiff is truly prospective non-monetary relief, sovereign immunity will not bar the suit simply because the state may be required to make *incidental* expenditures in complying with the injunction," *Barton v. Summers*, 292 F.3rd 944, 949-950, (6th Cir. 2002) (emphasis in original), citing to *Milliken v. Bradley*, 433 US 267, 289 (1977) ("federal courts are permitted to enjoin state official to conform their conduct to requirements of federal law via injunctions, notwithstanding a direct and substantial impact on the state treasury.") "The dividing line, therefore, is whether the money or the non-monetary injunction is the primary thrust of the suit." *Barton*, 292 F.3rd 949. Rather, the plaintiff's injury must be vindicated through non-monetary means, any expenditure of state funds – must be ancillary, i.e., not the primary purpose of the suit. *Barton*, 293 F.3rd 950. This is precisely the situation here.

In failing to follow the foregoing precedents and reasoning, the District Court's analysis of the Eleventh Amendment issue was flawed. It cannot be

48

gainsaid, that the primary thrust of this lawsuit is not to attach the state treasury, but to prevent the individual defendants, their successors or assigns, from continuing to deny Charlton-Perkins the equal protection of the laws by means of a court order placing him in the position he was wrongfully denied.

## VII. <u>CONCLUSION</u>

For all these reasons, Appellant Charton-Perkins respectfully requests that the Court reverse the award of summary judgment in favor of Appellees, University of Cincinnati, Kenneth Petren, and George Uetz, and remand this matter for further proceedings consistent with this Order.

Dated:  December 3, 2025                  Respectfully submitted,


                                          /s/ Marc D. Mezibov
                                          Marc D. Mezibov
                                          *Attorney for Appellant*

## VIII.  <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 10,380 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1).

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Marc D. Mezibov
Marc D. Mezibov

*Attorney for Appellant*

## IX.  CERTIFICATE OF SERVICE

I hereby certify that, on December 4, 2025 this Appellant's Merits Brief filed on the public docket via the Court's CM/ECF system.  Counsel will receive notice of, and be able to access, that redacted version via the CM/ECF system.

/s/ Marc D. Mezibov
Marc D. Mezibov

*Attorney for Appellant*

51

## X. ADDENDUM

- Doc. 27 PageID 151-2
- *Id*. at PageID 154; Exhibit A,
- Doc. 27-1, PageID 275
- Charlton-Perkins Dep. Doc. 27, PageID 221-4
- Charlton-Perkins Dep. Doc. 27, PageID 155
- Uetz Dep. Doc. 29, PageID 436
- Charlton-Perkins Dep. Doc. 27, PageID 215;
- Exhibit A, Doc. 27-1, PageID 275
- Uetz Dep. Doc. 29 PageID 436
- Buschbeck Dep. Doc. 31, PageID 923
- Charlton-Perkins Dep. Doc. 27, PageID 210;
- Buschbeck Dep. Doc. 31, PageID 933
- Uetz Dep. Doc. 29, PageID 392-396, 462
- Jayne Dep. Doc. 45, PageID 1484
- Hanson Dep. Doc. 47, PageID 1527;
- Buschbeck Dep. Doc. 31, PageID 795
- Uetz Dep. Doc. 29, PageID 402
- Hanson Dep. Doc. 47, PageID 1526-27
- Uetz Dep. Doc. 29, PageID 396, 451
- Buschbeck Dep. Doc. 31, PageID 795
- Jayne Dep. Doc. 45, PageID 1484-5
- Buschbeck Dep. Doc. 31 PageID 795
- Uetz. Dep. Doc. 29, PageID 403, 408, 410-411
- Petren Dep. Doc. 49, PageID 1565
- Buschbeck Dep. Doc. 792-796
- Uetz Dep. Doc. 29, PageID 408, 410-411
- Buschbeck Dep. Doc. 31, PageID 789-790
- Buschbeck Dep. Doc. 31, PageID 792
- Uetz Dep. Doc. 29, PageID 401-404;
- Exhibit 1, Doc. 29-1, PageID 601
- Uetz Dep. Doc. 29, PageID 404;
- Grogan Dep., Doc. 33, PageID 1095
- Uetz Dep. Doc. 29, PageID 392
- Doc. 31, PageID 793

- Uetz Dep. Doc. 29, PageID 406-407
- Buschbeck Dep. Doc. 31, PageID 789
- Grogan Dep. Doc. 33, PageID 1094-96
- Benoit Dep. Doc. 35, PageID 1150-51
- Gross Dep. Doc. 39, PageID 1290-91
- Buschbeck Dep. Doc. 31, PageID 798
- Exhibit 3, Doc. 29-3, PageID 634-6
- Charlton-Perkins Dep. Doc. 27 PageID 163
- Kershaw Dep. Doc. 41 PageID 1352
- Kershaw Dep., Doc. 41, PageID 1353-4
- Uetz Dep. Doc 29, PageID 437
- Buschbeck Dep. Doc. 31 PageID 903
- Charlton-Perkins Dep. Doc. 27, PageID 165
- Exhibit 26, Doc. 31-2, PageID 1017
- Exhibit 27, Doc. 27, PageID 1018
- MCP Dep. Doc. 27, PageID 170
- Buschbeck Dep. Doc. 31, PageID 858-61
- Exhibit 3, Doc. 29-3, PageID 639-640
- Buschbeck Dep. Doc. 31, PageID 859-61
- Exhibit 3, Doc. 29-3, PageID 639-640
- Buschbeck Dep. Doc. 31, PageID 859
- Uetz Dep. Doc. 29, PageID 438-9;
- Exhibit 3, Doc. 29-3, PageID 639-640
- Buschbeck Dep. Doc. 31, PageID 860, 884
- Uetz Dep. Doc. 29, PageID 443-444
- Charlton-Perkins Dep. Doc. 27, PageID 174
- Exhibit 27, Doc. 31-3, PageID 1018;
- Exhibit 28, Doc. 31-4 PageID 1019-23
- Buschbeck Dep. Doc. 31, PageID 837-843, 865—868
- Exhibit. 29, Doc. 31-5; PageID 1024;
- Exhibit 30, Doc. 31-6, PageID 1027-28
- Buschbeck Dep. Doc. 31, PageID 845-46; 879
- Charlton-Perkins Dep. Doc. 27 PageID 174-175;
- Exhibit 3, Doc. 29-3 PageID 642-43
- Buschbeck Dep. Doc. 31, PageID 878
- Exhibit 3, Doc. 29-3, PageID 643

53

- Uetz Dep. Doc. 29, PageID 461
- Charlton-Perkins Dep. Doc. 27, PageID 174;
- Exhibit 30, Doc. 31-6, PageID 174-175
- Buschbeck Dep. Doc. 31, PageID 867-879
- Exhibit 6, Doc. 29-6, PageID 652-656
- Exhibit 34, Doc. 31-10, PageID 1053-1056
- Exhibit 35, Doc. 31-11, PageID 1057-1060
- Doc. Exhibit 34, Doc. 31-10; PageID 1053-1056
- Exhibit 35, Doc. 31-11, PageID 1057-1060
- Buschbeck Dep. Doc. 31, PageID 871
- Exhibit 3, Doc. 29-3, PageID 643-44
- (Buschbeck Dep. Doc. 31, PageID 879-882
- Uetz Dep. Doc. 29, PageID 556
- Buschbeck Dep. Doc. 31, PageID 880
- Uetz Dep. Doc. 29, PageID 432, 556)
- Buschbeck Dep. Doc. 31 PageID 880-881
- Buschbeck Dep. Doc. 31, PageID 881-83
- (Buschbeck Dep. Doc. 31, PageID 883
- Buschbeck Dep. Doc. 31, PageID 886
- Uetz Dep. Doc. 29, PageID 432, 529
- Buschbeck Dep. Doc. 31, PageID 885
- Uetz Dep. Doc. 29, PageID 510
- Uetz Dep. Doc. 29, PageID 437
- Uetz Dep. Doc. 29, PageID 434
- Uetz Dep. Doc. 29, PageID 435
- Uetz Dep. Doc. 29, PageID 435
- Exhibit 30, Doc. 31-6, PageID 1028
- Uetz Dep. Doc. 29, PageID 429
- Uetz Dep. Doc. 29, PageID 486
- Petren Dep. Doc. 49, PageID 1588
- Uetz Dep. Doc. 29, PageID 534
- Uetz Dep. Doc. 29, PageID 529
- Exhibit 13, Doc. 29-13, PageID 728
- Uetz Dep. Doc. 29, PageID 559-61
- Exhibit 19, Doc. 29-19 PageID 753-54
- Buschbeck Dep. Doc. 31, PageID 894

- Uetz Dep. Doc. 29, PageID Exhibit 19, Doc. 29-19 PageID 753-54
- Uetz Dep. Doc. 29, PageID 559-61
- Exhibit 19, Doc. 29-19 PageID 752-53
- Uetz Dep. Doc. 29, PageID 559-61
- Exhibit 19, Doc. 29-19 PageID 749-750
- Buschbeck Dep. Doc. 31, PageID 899
- *Id.,* Exhibit 17, Doc. 29-17, PageID 740
- Buschbeck Dep. Doc. 31, PageID 904-5
- Exhibit 39, Doc. 31-15, PageID 1064
- Buschbeck Dep. Doc. 31, PageID 902-4
- Exhibit 39, Doc. 31-15, PageID 1064
- Buschbeck Dep. Doc. 31, PageID 902-5
- Exhibit 39, Doc. 31-15, PageID 1064-5.
- Buschbeck Dep. Doc. 31, PageID 902-4
- Exhibit 39, Doc. 31-15, PageID 1065
- Uetz Dep. Doc. 29, PageID 482, 528
- Exhibit 7, Doc. 29-7, PageID 658-9
- Exhibit 7, Doc. 29-7, PageID 660, 61, 664
- *Id.* at 670
- Exhibit 7, Doc. 29-7, PageID. 660
- Doc. 27 PageID 184,
- Ex. J, Doc. 27-10 PageID 303
- Doc. 1
- Doc. 8
- Doc. 9
- Doc. 12
- Doc. 13
- Doc. 21
- Doc. 50
- Doc. 55
- Doc. 58
- Doc 29, PageID 490
- Doc 29, PageID 560
- Doc. 29-19, Ex. 19, PageId 750
- Doc 29, PageID 535
- Doc 31-15, PageID 1064

55

- Doc. 55, PageID 1741-1743
- Doc. 55, PageID 1743
- Doc. 55 PageID 1744
- Doc. 55.  PageID 1731
- Doc. 49, PageID 1582-1584
- Doc. 55 PageID 1728
- Doc. 55, PageID 1729
- Doc. 29, PageID 535
- Uetz Depo., Doc. 29, PageID 559-561
- Ex. 19, Doc. 29-19, PageId 751-753.
- Doc. 31-15, Ex. 39, PageID 1064
- Doc. 29-6, PageID 654
- Exhibit 30, PageID 31-6, PageID 1028
- Doc. 31, PageID 838; Doc. 31-5,
- Ex. 29, PageID 1024
- Exhibit 7, Doc. 29-7, PageID 664
- Petren Dep. Doc. 49, PageID 1582-84
- Exhibit 39, Doc. 31-15, PageID 1064
- Uetz Dep. Doc. 29, PageID 446
- Exhibit 4, Doc. 29-4, PageID 647
- Hanson Dep., Doc. 47, PageID 1526, 1529-30
- Petren Dep. Doc. 49, PageID 1588
- Uetz Dep. Doc. 29, PageID 534
- Exhibit 19 *email dated 3/4/2018*, Doc. 29-19, PageID 753
- Doc. 29-19, Ex. 19 *email dated 3/5/2018*, PageId 753
- Kershaw Dep. Doc. 41, PageID 1377
- Benoit Dep. Doc. 35, PageID 116
- Uetz Dep. Doc. 29, PageID 441
- Buschbeck Dep. Doc. 31, PageID 853
- Buschbeck Dep. Doc. 31, PageID 852
- Uetz Dep. Doc. 29, PageID 441
- Jayne Dep. Doc. 45, PageID 1462
- Buschbeck Dep. Doc. 31, PageID 907
- Exhibit 7, Doc. 29-7, PageID 669
- Doc. 29-6, PageID 654
- Exhibit 30, PageID 31-6, PageID 1028

56

- Jayne Dep. Doc. 45, PageID 1460-65
- Buschbeck Dep. Doc. 31, PageID 898
- Kershaw Dep. Doc. 40 PageID 1355
- Petren Dep. Doc. 49, PageID 1574, 1578
- Benoit Dep. Doc. 35 PageID 1152
- Buschbeck Dep. Doc. 31 PageID 795
- Collective Bargaining Agreement §6.2.2, Exhibit 25, Doc. 31-1, PageID 1012,
- Uetz Dep. Doc. 29, PageID 494
- Buschbeck Dep. Doc. 31, PageID 975-76
- Uetz Dep. Doc. 29, PageID 539
- Exhibit 7, Doc. 29-7, PageID 664
- Petren Dep. Doc. 49, PageID 1582-84
- Doc. 55, PageID 1731-1732
- Doc. 55, PageID 1728

## RULE 30(g)(1) ADDENDUM
## DESIGNATING RELEVANT DOCKET ENTRIES

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g)(1), Appellees designate the following documents from the lower court record as relevant to the instant appeal:

| Record Entry # | Description | PageID |
|---|---|---|
| 1 | COMPLAINT with JURY DEMAND | 1 |
| 8 | AMENDED COMPLAINT | 3 |
| 9 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *PLAINTIFF'S AMENDED COMPLAINT* | 40 |
| 12 | ORDER | 84 |
| 13 | CLERK'S JUDGMENT | 95 |

57

| 50 | MOTION for Summary Judgment by Defendants | 1615 |
|----|----|----|
| 55 | ORDER granting 50 Motion for Summary Judgment | 1715 |
| 58 | USCA Case Number 25-3693 for 57 Notice of Appeal filed by Mark Charlton-Perkins | 1748 |
|  |  |  |

58